## TRAITEL MARBLE CO. v. U. T. HUNGERFORD BRASS & COPPER CO. *

(Circuit Court of Appeals, Second Circuit. March 14, 1927.)

No. 221.

1. Patents ⊚⟶27(1)—Slight structural changes in something new may support patent.

   Very slight structural changes in a thing that is new may be enough to support a patent, when they presuppose a use not discoverable without inventive imagination.

2. Patents ⊚⟶328—Reissue 15,824, for guide strips in laying terrazzo mosaic, held valid.

   Calkins reissue patent, No. 15,824, for guide strips in laying terrazzo mosaic, held valid.

3. Patents ⊚⟶327(14)—Patent infringement suit is in personam, and concludes only parties thereto.

   Suit for infringement of patent is in personam, and concludes only the parties thereto, and in a second suit, against other parties, another court is free to disregard earlier ruling thereon, if so advised.

Appeal from the District Court of the United States for the Southern District of New York.

Patent infringement suit by the Traitel Marble Company against the U. T. Hungerford Brass & Copper Company. From a decree of dismissal (16 F.[2d] 495), plaintiff appeals. Reversed and remanded, with directions.

Appeal from a decree of the District Court for the Southern District of New York, dismissing a bill in equity for infringement of reissue patent, 15,824, to S. H. Calkins.

Calkins, the plaintiff's assignor, filed his

original application on November 15, 1919, upon an invention for guide strips in laying "terrazzo mosaic," and the patent issued on March 15, 1921. It disclosed a means of laying upon a concrete flooring a top layer of variously colored concrete surface made in some pattern, and designed roughly to imitate a mosaic. To do this properly it was necessary to secure a bond between the two layers, by adding the second while the first was still wet. Calkins used thin strips, preferably of metal, but in any case capable of bending, since the patterns were at times curved. These he pushed down vertically into the concrete base, while it was still plastic, setting them in the desired patterns, which could then be filled with various colored cements. The lower half of the strips were at intervals slit from about the middle line to the lower edge, and the tabs so made were bent up upon the line between the tops of the slits until they formed horizontal wings on either side of the strip, parallel to its upper edge. These wings acted as a stop to the descent of the strip as it was pushed into the lower layer, so that the upper edge should be at a constant level above the face of the lower layer, which was leveled off on its completion. The intervals left in the lower half of the strips allowed the under layer to pass uninterruptedly through the strip at those points, and so secured a continuous bond. The patent met with wide success and is now used in nine-tenths of all the "terrazzo mosaic" laid in this country. It avoided some of the earlier difficulties experienced in such work, and was required in many building specifications.

In 1922 the plaintiff sued certain persons other than the present defendant upon the patent in the Southern District of New York and was defeated on the ground that the patent as it stood was anticipated by the prior art. In that case claim 1 as it then stood was at issue; it was as follows:

"A pattern and guide strip comprising a flat strip of metal having a straight edge, said strip being formed with part thereof pressed out so as to extend to one side of the main part of the strip and act as anchoring means when embedded in plastic material, said pressed out member being arranged so that its flat faces will be in planes parallel with said straight edge."

About 10 months later and on February 14, 1924, the plaintiff, which did not appeal, conceiving that it might meet the objections which had been raised to the patent, filed an application for reissue, which was allowed, and on which the patent in suit was granted

on April 29, 1924. It is not necessary, in view of the court's opinion, herein to set forth the allegations of the application for a reissue, or the changes in the body of the specifications, which were of no substantial consequence and did not broaden the invention. Claim 1, the only one now in suit, as it appeared in the reissue, reads as follows:

"A pattern and guide strip of the character described, comprising a substantially flat thin flexible strip of metal extending vertically in cross section, and having a width adapting the strip to serve as a height guide in placing a desired thickness of plastic material on a wall or flooring, and having an uninterrupted straight upper edge defining the upper level of said plastic material, and a plurality of wings pressed out of said strip from substantially the central longitudinal line, to and including portions of the lower edge thereof, and extending outwardly from opposite sides of said strip, with the faces of said wings substantially parallel with the upper edge of the strip, said wings defining the depth of the finishing coat of said material relative to the upper surface thereof."

Upon this appeal the question of infringement need not be considered, but the defendant attacks the validity of the claim for a number of reasons connected with the reissue, and also because both the original claim and that now in suit were anticipated. In the opinion of the court is stated the substance of the supposed anticipations.

The learned judge, conceiving that the decision in the former suit was conclusive upon him, followed it, and determined that the changes upon the reissue did not avoid the earlier references, which had induced the judge in the first suit to declare the patent void.

Robert W. Hardie, of New York City, for appellant.

Darby & Darby, of New York City (Samuel E. Darby, Jr., and Walter A. Darby, both of New York City, of counsel), for appellee.

Before MANTON, HAND, and SWAN, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). Guide strips for precisely the same purpose as Calkins' were indeed old in November, 1919, when he filed his first application; they are disclosed in the Swiss patent to Cassani of 1910. They left no scope for invention, except in the form of the strips themselves. Probably Cassani assumed that the patterns might be curved, though he did not so show them, but in any case that would

make no difference, because his strips were of thin metal, and to bend them was at best no more than a new use of his disclosure. But Cassani showed strips without wings, or any intervals to create a bond, and Calkins certainly made a patentable advance over what he had done; indeed, we do not understand that so much is denied.

Perhaps the nearest approach to the form of Calkins's strips was McKnight's, disclosed as early as 1883. That, it is true, was a patent for a pavement, apparently a street pavement; but that would scarcely in itself be a sufficient distinction, if it were all. He described a concrete pavement laid in several layers, three as it chanced, in which he wished to avoid cracks. This he sought to do by dividing into square sections the two upper layers, or it might be all three, by straight vertical strips, which were set in the lower layer, and in some cases had horizontal wings, apparently along the whole length of the strip. The strip was set in the lower layer while it was being laid, and, as its upper edge did not reach the top of the upper layer, it could make no pattern in it, which, indeed, would not have been desirable. Moreover, the wings were not struck out of the lower half of the strip, but extended along its whole length. Even had the device been used for the same purpose as Calkins's, we should have some doubt whether these differences were not enough; but in view of the fact that McKnight's purpose and his result were quite different, structural distinctions which might be trivial become crucial.

[1] Assuming, for argument, that the law is absolute that there can be no patent for the new use of an old thing, that is because the statute allows no monopolies merely for ideas or discoveries. If the thing itself be new, very slight structural changes may be enough to support a patent, when they presuppose a use not discoverable without inventive imagination. We are to judge such devices, not by the mere innovation in their form or material, but by the purpose which dictated them and discovered their function. Certainly the art would have waited indefinitely, in the light of all that McKnight disclosed for Calkins's contribution to its advance. It will not serve now to observe how easy it was, given the suggestion, to change his invention into that of the patent in suit.

Kahn's patent of 1912 is the best anticipation after McKnight's. He disclosed a metal and concrete beam, in which metal was reinforced by concrete, rather than concrete by metal. So far as his patent concerned side-walk lights, we need not pause to describe it. His nearest approach to Calkins was in Figures 5 and 6, where he showed beams set in concrete, having tabs struck out of the metal at intervals to receive transverse connecting rods. The holes so made did indeed permit a bond between the sections of concrete created by the beams, and the similarity to Calkins's invention arises from this fact and from the form of the wings. But the resemblance stops there. The beams were wholly unfitted for use as guide strips. They had heavy flanges at the bottom, like ordinary I-beams, and the web was of solid material. They were not designed to come to the surface of the top layer of concrete, and could not be depressed into the lower; the wings did not, and could not, serve as stops to mark off the height to which the top layer was to be filled. It was to distinguish from this patent that the change in claim 1 was made, which required the slits which formed the wings to run to the lower edge of the strip. Such a distinction was quite unnecessary, and would have been ineffectual, if it had been.

Chadbourne's patent of 1910 was for a reinforcing grid, apparently to give tensile strength to the lower part of a concrete mass laid in different layers. The grid rested on transverse strips of metal, rising about an inch above the bottom of the lowest layer; these had bases turned horizontally to hold the strip upright, one side of which was struck out of the metal which formed the upright part, leaving a space through which the concrete could form a bond. So far as we can see, this resulted in nothing approaching Calkins's disclosure, for such obvious reasons that we forego their statement.

Baker's patent was also for a street pavement, laid in sections made by dividing plates of metal. The concrete was homogeneous throughout, and there was no such problem as Calkins had to meet. The plates were set in pairs, with a separating material of asphalt or the like. They had flanges at right angles to the main body, and were set at an angle to the surface of the pavement and to each other, so as to make a slight trench at the surface, and to flare away from each other into the body of the cement, serving as anchors. The only resemblance, and that the faintest, to Calkins's invention, lay in the fact that there were openings in the main body of the plates to allow a bond of concrete to flow through.

The only other supposed anticipation which seems to us worth notice is Del Turco's. This invention was, indeed, for the same pur-

pose as Calkins's, and the differences between them well illustrate his contribution. The guide strip, set in a wooden base, was placed in position when the lower layer was made, not forced down into it. There were no wings and no openings to lock the underlying concrete. This was the best that the art had done, and it was very far from Calkins.

[2] Thus the case is in substance familiar enough, one in which the inventor has culled this and that out of nearby arts, and so formed a combination nowhere before existing. It has been a success; it has substantially driven out earlier cumbersome methods; it has enabled the art to do with ease what before it could only do slowly and imperfectly. The result seems to us a genuine invention, and we so hold.

Little need be said of the reissue, in view of what has gone before. The learned District Judge who tried the suit at bar was, of course, quite right in seeing no substantial change between the original patent and the reissue. Accepting the decision in the first suit, he had no choice but to hold the patent void, and our difference with him is not in that conclusion, but in his acceptance of the original holding, which went, not to the sufficiency of the claim, but to the invention as a whole. We should, indeed, agree that there was no invention in cutting the wings through to the base of the strip, if that had been all that Calkins did; that was a mere detail of design. In fact, he had no need of a reissue at all; his original claim was quite narrow enough; his first disclosure was complete. Indeed, the new claim added nothing of substance to the old. To call the strip "thin" and "flexible" was unnecessary, since that was apparent anyway. So far as the new claim comprised the functions of the strip, it was improperly drawn, though the additions were harmless.

[3] However, though the reissue was unnecessary, the first patent being good enough as it stood, it did no harm if the patentee timidly chose to contract his claim. What he lost by so yielding, he lost; but it did not affect what was left. Nobody could be hurt by that but Calkins himself. Thus we find it quite unnecessary to consider the points raised over the reissue. There could be no intermediate rights acquired in the face of a valid patent adequately claimed. Nor do we understand what is meant by speaking of the decision in the first suit as a final adjudication upon the patent, good as against all, unless reversed on appeal. Such a suit is in personam; it concludes the parties, and it concludes nobody else. A second suit against other parties starts afresh, and the second court is free to disregard the earlier ruling, if so advised—a common event, out of which arise nearly all patent cases that reach the Supreme Court. That under the canon, stare decisis, an earlier decision will have much weight is true enough, but each court is bound in the end to exercise an independent judgment.

Penn Electric & Mfg. Co. v. Conroy, 185 F. 511 (C. C. A. 3), was a second suit between the same parties as had litigated the first. The point was res judicata in the strict sense, and the decision has nothing to do with the case at bar.

Decree reversed, and cause remanded, with instructions to grant a decree for the plaintiff.