## TRAITEL MARBLE CO. v. MANHATTAN TERRAZZO BRASS STRIP CO., Inc.
### (two cases).

District Court, S. D. New York.
March 18, 1932.

On final hearing of two suits in equity brought by the assignee of two patents, based (1) as to the first, on an alleged infringement of claim No. 3, of the reissue patent U.

S. Re 15,824, in which the reissue was applied for February 14, 1924, and granted April 29, 1924 (as a reissue of United States patent No. 1,371,857, dated March 15, 1921, for which the application was filed November 15, 1919), to Seward Homer Calkins for a pattern and guide strip, and (2) as to the second suit, on an alleged infringement of claims Nos. 4, 5, 6, and 7 of United States patent No. 1,451,491, which was applied for on August 31, 1920, and issued to Seward Homer Calkins on April 10, 1923, also for a pattern and guide strip.

Briesen & Schrenk, of New York City (Hans V. Briesen and Fred A. Klein, both of New York City, of counsel), for plaintiff.

Frank J. Kent, of New York City (George F. Scull and Charles F. Chisholm, both of New York City, of counsel), for defendant.

WOOLSEY, District Judge.

My decision in the first suit, equity No. 47—121, is that, as between these two parties, claim No. 3 of the reissue patent No. 15,824 has been established by a previous decision and decree of this court to be valid as a reissue claim, and that the device of the defendant, of which complaint is here made, infringes that claim.

Accordingly, an interlocutory decree in the usual form embodying an injunction and providing for a reference, and carrying costs to the plaintiff, may be entered in this suit.

My decision in the second suit is that claims Nos. 4, 5, 6, and 7 of United States patent No. 1,451,491, which have been held valid as between these parties in this court, are infringed by the defendant's device of which complaint is here made.

Accordingly, an interlocutory decree in the usual form embodying an injunction and providing for a reference, and carrying costs to the plaintiff, may be entered in this suit also.

I. These are two suits under the patent law. There is not any question involved in either of them as to the venue or the ownership of the patents, or as to their validity. The principal question involved is a question of whether the devices of the defendant complained of in the two suits fall within the scope of the claims respectively invoked by the plaintiff in the two suits, and hence, whether they constitute infringement thereof.

II. By way of preface I think I should summarize shortly the previous juridical history of these two patents.

The original Calkins patent, United States patent No. 1,371,857, was first held invalid for lack of invention by Judge Bodine of New Jersey, while sitting in this court, in an unreported decision dated May 1, 1923, in the three cases brought by the Traitel Marble Company against Lewis DePaoli, Arthur Avon, and Frank L. Davis respectively. Cf. Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co. (D. C.) 16 F.(2d) 495 at 496.

The Traitel Marble Company did not appeal from Judge Bodine's decision, but, instead, Calkins, on February 14, 1924, filed an application for a reissue of his patent. The reissue was granted on April 29, 1924.

On the reissued patent the Traitel Marble Company brought suit against the U. T. Hungerford Brass & Copper Company, and Judge Goddard, following Judge Bodine's decision regarding the validity of the patent, considered himself concluded on validity, and held that the reissue patent could not be valid if the original patent was invalid for lack of invention. Consequently he decided in favor of the defendant and dismissed the case. Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co. (D. C.) 16 F.(2d) 495.

On appeal this decision was reversed by the Circuit Court of Appeals, Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co. (C. C. A.) 18 F.(2d) 66, which held that the original patent had been valid, and, consequently, claim 1 of the reissue patent was held valid, and a decree of infringement was given against the Hungerford device in question.

Judge Learned Hand wrote the opinion and, after discussing certain references to the prior art, he said at page 67 of 18 F.(2d): "They left no scope for invention, except in the form of the strips themselves."

At page 68 of 18 F.(2d), he said:

"If the thing itself be new, very slight structural changes may be enough to support a patent, when they presuppose a use not discoverable without inventive imagination. We are to judge such devices, not by the mere innovation in their form or material, but by the purpose which dictated them and discovered their function. Certainly the art would have waited indefinitely, in the light of all that McKnight disclosed for Calkins' contribution to its advance. It will not serve now to observe how easy it was, given the suggestion, to change his invention into that of the patent in suit. * * *

"Thus the case is in substance familiar enough, one in which the inventor has culled this and that out of nearby arts, and so formed a combination nowhere before existing. It has been a success; it has substantially driven out earlier cumbersome methods; it has enabled the art to do with ease what before it could only do slowly and imperfectly. The result seems to us a genuine invention, and we so hold. * * *

"In fact, he [Calkins] had no need of a reissue at all; his original claim was quite narrow enough; his first disclosure was complete."

As to the second patent, United States patent No. 1,451,491, suit was brought against the U. T. Hungerford Brass & Copper Company by the Traitel Marble Company, on claims 4, 5, 6, and 7, which are the claims here involved.

A preliminary injunction was granted in this court, and on appeal was affirmed November 1, 1927, Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co. (C. C. A.) 22 F.(2d) 259, and the above claims of the patent held valid.

Judge Learned Hand, who wrote the opinion in this second Hungerford Case also, thus described the relation between the structures of the two patents in, the statement of facts preceding his opinion, 22 F.(2d) at 259:

"The general features of the invention are described in the decision of this court in a suit between the same parties upon Calkins' earlier patent, reissue 15,824, reported in 18 F.(2d) 66. That patent was originally applied for on November 15, 1919, and issued on March 15, 1921. It was reissued on April 29, 1924, the claims being narrowed, as will be hereinafter shown. The patent in suit was applied for on August 31, 1920, and, issued on April 10, 1923, before the application for reissue of the earlier patent had been filed.

"In both patents a flexible metal strip is used to lay out into patterns the upper terrazzo layer of a concrete flooring. This layer is of a depth equal only to half the width of the strip, which must in consequence be forced down into the wet lower layer of concrete. The lower half of the strip is slit at intervals, and the material struck out from the slits is bent up at right angles to the strip alternately on opposite sides, so that the resulting 'ears' form stops for the descent of the strip into the concrete. In the original disclosure, the slits went to the lower edge of the strip, so that the 'ears' projected laterally for half the width of the strip. The only difference between this and the claims in suit is that 'ears' of less width are struck out, leaving the lower edge of the strip continuous."

Two suits, equity No. 41—268 and equity No. 41—269, have been heretofore brought by this plaintiff against this defendant on these patents. The first of the above-numbered suits was brought on the reissue patent, and the second on United States patent No. 1,451,491. These two suits which, accordingly, involved the same patents as are now before me, were dealt with together throughout.

On August 2, 1927, Judge Bondy granted a preliminary injunction entitled in both suits. Appeals from the orders entered on this decision were taken, but were dismissed by consent.

Before December 5, 1927, when the two suits—equity No. 41—268 and equity No. 41—269—came on for trial before Judge Thacher, the Circuit Court of Appeals had, as above stated, sustained both patents—the reissue patent on March 14, 1927, in an opinion reported in 18 F.(2d) 66, and United States patent No. 1,451,491, on November 1, 1927, in an opinion reported in 22 F.(2d) 259.

As a consequence of these decisions of the Court of Appeals, the two cases were not seriously contested by this defendant before Judge Thacher. An examination of the court records therein shows that at the trial the plaintiff put in its prima facie case, and that the defendants then rested without offering evidence. The minutes of the trial covered only four typewritten pages. At the end of the trial, Judge Thacher granted to this plaintiff in each case the usual interlocutory decree embodying an injunction and order for reference to a special master.

Interlocutory decrees were signed by Judge Thacher pursuant to this decision on December 12, 1927, after their form had been approved by defendant's counsel in writing. These decrees show that in equity No. 41—268, claims 1, 3 and 4 of the reissue patent No. 15,824, and in equity No. 41—269, claims Nos. 4, 5, 6, and 7 of United States patent No. 1,451,491 were involved and sustained as valid and held infringed by structures then made by the defendant.

The damages were ultimately agreed, and final decrees entered in both suits on January 15, 1928, in which the injunctions were made permanent and the provisions of the interlocutory decrees for reference to a Master were canceled.

There was not any appeal by this defend-

ant from these decrees so granted to this plaintiff.

From the foregoing summary, it will be seen that the two suits now under consideration by me bristle with estoppels against the defendant, and that it would have to walk warily to escape them.

III. Equity No. 47—121, on U. S. patent reissue No. 15,824.

This suit is founded on claim No. 3 of the reissue patent. That claim reads as follows: "3. A pattern and guide strip of the character described, comprising a substantially flat thin flexible strip of metal extending vertically in cross section, and having a width adapting the strip to serve as a height-guide in placing a desired thickness of plastic material on a wall or flooring, and having an uninterrupted straight upper edge defining the upper level of said plastic material, and a plurality of pairs of wings, the respective members of each pair being arranged in juxtaposition on opposite sides of said strip and extending outwardly therefrom on substantially the central longitudinal line of said strip, with the faces of said wings substantially parallel with the upper edge of said strip, said wings defining the depth of the finishing coat of said material relative to the upper surface thereof."

As above noted, the only claim of the reissue patent before the Circuit Court of Appeals in 18 F.(2d) 66 was claim No. 1. The instant suit, equity No. 47—121, on the reissue patent, is, however, based on claim No. 3 thereof.

It is admitted by the defendant's counsel that this claim reads exactly on the defendant's device, which is illustrated by Exhibits 3 and 5, and his only recourse, therefore, in the present case, has been to contend that claim No. 3 was such a broadening of the claims of the original patent as to render it bad as a reissue.

The Circuit Court of Appeals in the first Hungerford suit, 18 F.(2d) 66, in dealing with claim No. 1 of the reissue patent, said, 18 F.(2d) at page 69: "The new claim added nothing of substance to the old."

And in the second Hungerford suit (C. C. A.) 22 F.(2d) 259, at page 260, in the statement of facts, Judge Learned Hand, referring to Calkins' application for the reissue patent, says: "On that showing he procured his narrower reissue claims."

But the Circuit Court of Appeals had had only claim No. 1 of the reissue before it, and what it said should, it seems to me, be read in connection with that claim.

Consequently, in spite of the statements just quoted, if this suit were the first suit between this plaintiff and this defendant in which claim No. 3 of the reissue was involved, I should lend a hospitable ear to the argument of the defendant's counsel that claim No. 3 of the reissue is broader than any claim of the original patent, for in claims 1, 2, and 3 thereof, which alone deal with the structure of the strip itself, its form is limited to wings pressed out of the strip. It is persuasively arguable, therefore, that claim No. 3 would be bad as a reissue claim because it certainly covers forms of the strip in which the wings are not pressed out of the substance of the strip itself, and so is broader than the claims of the original patent.

In this case, however, the present defendant is, I think, precluded from thus challenging claim No. 3 of the reissue because it has been established, between the present plaintiff and the present defendant, by the decree in their previous suit on the reissue patent, equity No. 41—268, above referred to, that claim No. 3 of the reissue was a good reissue claim, and that question, therefore, is res adjudicata between the parties.

In the face of that decree, which creates herein an inescapable estoppel on the defendant from now asserting the invalidity of claim No. 3, the ingenious argument of its present counsel must fail.

I hold, therefore, in the first suit, No. 47—121, that the plaintiff must have an interlocutory decree carrying costs and providing for an injunction and the usual order of reference to a special master.

IV. Equity No. 53—326. Suit on United States patent No. 1,451,491.

A. This suit is founded on claims Nos. 4, 5, 6, and 7 of the patent.

These claims read as follows:

"4. A pattern and guide strip comprising a flexible strip of metal adapted to be forced vertically into a body of plastic material, said metal strip being provided with longitudinally spaced openings therein intermediate its opposite edges and having means projecting horizontally from one side of the strip at the upper edge of each opening, said means constituting stops limiting the penetration of one edge of the strip into the plastic material and also acting to tamp the material and urge the same within said openings.

"5. A pattern and guide strip comprising a flexible strip of metal adapted to be forced vertically into a body of plastic material, said metal strip being provided with longitudinally spaced openings therein and having means projecting horizontally from one edge of each opening to limit the penetration of one edge of the strip in the plastic material and to tamp the material within said openings, said strip also having means at the opposite edge of each opening acting to firmly anchor the strip in the plastic material against an upward vertical movement.

"6. A pattern and guide strip comprising a thin strip of metal having longitudinally elongated spaced openings therein and ears projecting horizontally from one side of the strip at the upper edges of said openings and co-extensive in length with said openings, said ears constituting stops limiting the penetration of the lower edge portion of the strip into a body of plastic material, and also acting to tamp the plastic material into said openings.

"7. A pattern and guide strip for floors of plastic material having longitudinally spaced ears pressed out of said strip and extending at right angles to the plane thereof, said ears providing openings in the strip bridged at the sides of said openings remote from the ears by longitudinally extending body portions of the strip, the edge portion of the strip having said openings therein adapted to be embedded in a body of plastic material, said openings receiving the plastic material of the under-bed and the bridge portions of said strip at the sides of the openings constituting anchor means preventing upward movement of the strip in the under-bed."

B. These four claims were not only held valid by the Circuit Court of Appeals in the second suit against Hungerford, 22 F.(2d) 259, but were also sustained as valid against this defendant by Judge Thacher's decision in equity No. 41—269, above referred to, and the decrees consequent thereon.

In the second instant suit, therefore, we have—so far as I am concerned—a pure question of infringement, uncomplicated by any possible infirmity of the claims of the patent here involved.

The question of infringement of these claims brings us back to the scope of the claims of the Calkins' patents.

If we take the original Calkins' patent now reissued as the generic patent for what might be called the terrazzo strip, and United States patent No. 1,451,491, as a patent for a species thereof, available to Calkins for the reasons set forth at length by Judge Learned Hand in the second Hungerford suit (C. C. A.) 22 F.(2d) 260, 261, we must remember that, in fixing the limit of the generic patent, Judge Learned Hand, dealing with the patentable subject matter of Calkins, said, in the first Hungerford suit (C. C. A.) 18 F.(2d) 66, at page 67, that the reference to the prior art "left no scope for invention, except in the form of the strips themselves."

I must, in view of that decision, deal with the patentable subject-matter of United States patent No. 1,451,491, also as thus defined.

Claims Nos. 4, 5, 6, and 7 of United States patent No. 1,451,491 do not read directly on the defendant's infringing device, as illustrated by Exhibits Nos. 2 and 4.

The defendant's device here involved, instead of having horizontal ears bent out of the strip leaving a lower continuous edge, has, pressed out of the strip arcs, bows, or loops, slightly coned from their upper to their lower edge.

The claims of the patent on which the second suit is based emphasize some extremely ingenious qualities of Calkins' structure. They refer to the additional anchoring quality, achieved by the uninterrupted lower edge of the strip; they also refer, not only to the effect which the horizontal wings will have in marking the penetration of the strip into screed or any other plastic material into which they may be pressed, but also to their effect in tamping that material, and thus tending to force it into the openings out of which the wings have been pressed. It will be seen, of course, that this is true; for, if the wing is pressed out of the strip, and is not thereafter reduced in size, when it is forced into such a plastic material as screed, the material, under the well-known laws of fluids, will tend to go into the opening where the wing was taken out, and the amount of material displaced by the wing, when forced into the plastic material only to such a depth as to make its upper side level therewith, will be precisely the same as the amount of material necessary to fill in the hole from which the wing was pressed. Thus the anchoring of the strip and the depth of its submersion in the screed, and, hence, the measure of the depth of the terrazzo to be superimposed thereon, are automatically accomplished by its form.

The real invention of Calkins was not a wing which prevented the strip from being

submerged beyond it in the screed; for whether it could be so submerged or not would depend on the pressure brought on the strip, and the hardness of the screed.

Calkins' invention was a strip of such a structure as to enable the user automatically to fix the depth of the terrazzo which is to be laid on the screed and firmly to fix the strip in the screed.

These purposes are accomplished as well by the defendant's device, illustrated by Exhibits 2 and 4, as by the plaintiff's device and in the same or substantially the same way. For the upper edges of the defendant's coned arcs are all at equal distances from the upper edge of the strip, and thus by submerging them in the screed to the top of the arc, as indicated in Sweet's Catalogue, Exhibit O, by hand or by a setting edge, the depth of the terrazzo layer to be put on top of the screed is fixed just as by the plaintiff's device.

So far as the anchoring effect and the encouragement thereof by tamping, the defendant achieves this by the unbroken lower edge of its strip and by the coning of its arcs which tends directly to press the screed into the opening out of which the arcs are bent. This is the equivalent of tamping, though the pressure is oblique rather than direct.

In normal and intended use, therefore, the defendant's device accomplishes in substantially the same way the very same result as the plaintiff's device accomplishes.

The evidence is clear that marketwise the Calkins device has had immense success, and, however narrow the scope of his invention may be, his patent is entitled to a range of equivalents which will effectually protect its monopoly. Cf. Eibel Process Company v. Minnesota & Ontario Paper Co., 261 U. S. 45, 63, 43 S. Ct. 322, 67 L. Ed. 523; Gibbs v. Triumph Trap Company, 26 F.(2d) 312, 314 (C. C. A. 2).

I think that the situation here falls clearly within the definition of equivalents which is found in the case of Sanitary Refrigerator Company v. Winters, 280 U. S. 30, 42, 50 S. Ct. 9, 74 L. Ed. 147. There, Justice Sanford said, at page 42 of 280 U. S., 50 S. Ct. 9, 13, 74 L. Ed. 147, after dealing with various definitions of equivalents: "And even where, in view of the state of the art, the invention must be restricted to the form shown and described by the patentee and cannot be extended to embrace a new form which is a substantial departure therefrom, it is nevertheless infringed by a device in which there is no substantial departure from the description in the patent, but a mere colorable departure therefrom."

A case somewhat analogous to the present case is that of Auto Vacuum Freezer Company v. William A. Sexton Company (C. C. A.) 239 F. 898. In that case, the patentee had invented an ice cream freezer which had immense popular success and which was held by the Circuit Court of Appeals to be patentable. The defendant therein had first made an almost precise copy of the patented device, just as the defendant in the present case did when he was enjoined by Judge Thacher in equity No. 41—269.

Then the defendant in the ice cream freezer case made another freezer, which omitted certain elements of the combination covered by the claims in controversy. Judge Coxe answered what he described as an able argument of the defendant in support of his contention that he did not infringe, by saying at page 900 of 239 F.:

"But it is also true that when the patentee has produced a structure which inaugurates a new industry and at once becomes popular, and therefore of great value, the court should be zealous so to construe the claims as to give validity to what it believes to be a meritorious invention.

"The complainant had built up a large and flourishing business under its patent, when the defendant, with knowledge of the patent and the popularity of the complainant's freezer, began its infringement by copying the patented device even to minute details. There can be little doubt that the defendant, with full knowledge of the McCann patent, continued to copy the structure there described and claimed and offered it to the public as a patented freezer. In such circumstances the rule laid down in the cases above cited is relaxed to the extent of giving the patentee a range of equivalents sufficiently broad to hold as an infringer one who accomplishes the result by the same or similar means. The doctrine of the cases relied on by the defendant must be read in the light of the authorities which hold that even an element of a combination may be omitted if the defendant accomplishes the result by substituting equivalent means. If this were not so, claims for combinations could be easily evaded. This rule is clearly stated in Machine Co. v. Murphy, 97 U. S. 125, 24 L. Ed. 935, where the court says:

" 'So that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are

the same, even though they differ in name, form, or shape.' * * *

"Regarding type B, the freezer sold by the defendant at the time this action was brought, there can be no doubt regarding its infringement of the claims if they are liberally construed and given a fair range of equivalents."

I am satisfied from the evidence before me that Calkins made an important useful improvement in strips for laying terrazzo and floors of similar material, and as a result the plaintiff as his assignee has been properly rewarded with great commercial success. For a number of years the defendant has, apparently, endeavored, by various inconsequential changes in the strip which it uses, to put itself in such a position as will enable it without danger to share the plaintiff's markets. In the present instance I hold that it has failed to do so.

C. I turn now to an attempted affirmative defense.

After the reference ordered in equity No. 41—268 and equity No. 41—269 had proceeded for some time, a written agreement was made on January 26, 1928, to settle both cases for $7,500.

After this settlement had been agreed at $7,500, Mr. Hardie, the solicitor for the plaintiff, the Traitel Marble Company, went, on January 26, 1928, to the office of Mr. Kent, the solicitor for the defendant, the Manhattan Terrazzo Brass Strip Company, Inc., to close the settlement. In connection with the settlement Mr. Kent seems to have insisted on securing from Mr. Hardie a letter, which is now pleaded in the instant case as a license to make the strip of which the Traitel Marble Company complains herein.

This somewhat unusual episode took the following form:

Mr. Kent addressed and delivered a letter to Mr. Hardie, who was then in his office, which reads as follows:

"Jan. 26, 1928
"Mr. Robert W. Hardie, Fanwood, N. J.
"Dear Mr. Hardie: In connection with the settlement of the two cases of The Traitel Marble Company against Manhattan Terrazzo Brass Strip Company, Inc., Equity 41—268 and 41—269, in the U. S. District Court for the Southern District of New York, it is my understanding and that of my client, that Manhattan Terrazzo Brass Strip Company, Inc. is free so far as The Traitel Marble Company is concerned, to make and sell terrazzo strip embodying features of construction shown in the strips illustrated in an advertisement by the Manhattan Terrazzo Brass Strip Company, Inc., appearing on page B 1413 of the book entitled "Sweet's Architectural Catalog, Twenty-second Annual Edition, 1927–1928, Section B, Sweet's Catalogue Service, 119 West 40th Street, New York, N. Y., and I have consented to the settlement with that understanding.
"Yours very truly, Frank J. Kent."

Thereupon Mr. Hardie, in Mr. Kent's office, without his client's knowledge or authority, wrote and delivered to Mr. Kent a letter on Mr. Kent's own letterhead as follows:

"Jan. 26, 1928
"Mr. Frank J. Kent, 233 Broadway, New York, N. Y.
"Dear Mr. Kent: Answering your communication of the 26th inst.:
"The strips shown on page B 1413 of Sweet's Architectural Catalogue 1927–1928, consists, in one case, of a band pressed out from the body of the strip and arranged vertically. That does not infringe either of the patents involved in the suits of The Traitel Marble Company against Manhattan Terrazzo Brass Strip Company, Inc., Equity 41—268 and 41—269, in the U. S. District Court for the Southern District of New York. That construction does not show wings pressed out from the body of the strip and arranged substantially horizontally.
"The other strip has portions in half-conical outline pressed out from the body of the strip and arranged with their axial line extending vertically. That does not infringe either of the patents involved in the two suits you refer to.
"Very truly yours,
"[Signed]   Robert W. Hardie,
"Atty for The Traitel Marble Company."

It is perfectly obvious that this letter did not constitute a license, and, unless more is shown than appears in the record in the present case, it could not possibly be held to be any kind of an estoppel on the plaintiff.

Moreover, as one reads Mr. Hardie's letter, and looks at the catalogue cut contained in Sweet's Catalogue, Exhibit O, to which he referred therein, one is drawn to feel that he had, apparently, got the impression that the arcs, loops, and bows of defendant's strip were perpendicular when the strip was in position, and thus did not have any effect in determining the depth to which the strip would be normally submerged in screed or other plastic material.

The highest status to which this letter of Mr. Hardie could rise is that of an opinion—and, apparently, a careless one—by a man who knew the Calkins' patents; and, in accepting it and relying on it, the defendant acted at his own risk.

This whole Hardie-Kent episode seems to have been an attempt on the part of Mr. Kent to secure what I may perhaps call an intellectual alibi for his client which, in the event of a new suit being brought, or of a prosecution for contempt under the decrees in equity Nos. 41—268 and 41—269, would give it grounds for arguing, as is done here, that the defendant was not an infringer because in making the strip complained of it was acting under advice of the plaintiff's counsel.

This, I think, entirely disposes of the extensive argument based on Mr. Hardie's letter, and makes it clear that the defendant cannot invoke that letter as a defense.

V. This opinion may stand as the findings of fact and conclusions of law required under Equity Rule 70½, Title 28, U. S. Code, § 723 (28 USCA § 723), and I will sign orders so providing. Hazeltine Corporation v. Radio Corporation (D. C.) 52 F.(2d) 504, 512; Lewys v. O'Neill (D. C.) 49 F.(2d) 603, 618; Briggs v. U. S., 45 F.(2d) 479, 480 (C. C. A. 6). Cf. also, El Sol (D. C.) 45 F.(2d) 852, 856, 857.

Orders to this effect may be separately presented or embodied in the interlocutory decrees hereinabove provided for, which may be presented to me for signature on two days' notice.