49 CCPA

**Application of Andrew ALFORD.**

**Patent Appeal No. 6757.**

United States Court of Customs and Patent Appeals.

April 13, 1962.

Rehearing Denied June 8, 1962.

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of

Charles Hieken and Ezekiel Wolf, Wolf & Greenfield, Boston, Mass., for appellant.

Clarence W. Moore, Washington, D. C. (D. Kreider and George C. Roeming, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Judges, and Judge WILLIAM H. KIRKPAT-RICK.*

MARTIN, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the action of the Primary Examiner in refusing to allow claims 19, 20 and 22 of application Serial No. 596,-930, filed July 10, 1956, entitled "Coaxial Choke Coupler." Claim 21, the only other claim in the application, was allowed by the examiner.

Claim 19 is representative of the appealed claims and reads as follows:

"19. A coaxial choke coupler for transmitting high frequency energy over a band in the range from 100

Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

megacycles to 5000 megacycles about a mean frequency, said coupler comprising, coaxial inner and outer conductors, inner and outer insulating sections in said inner and outer conductors respectively, said sections dividing each conductor into first and second portions, said inner conductor insulating section being coextensive with the first and second portions of said inner conductor along the axis common to said conductors for a distance substantially equal to a quarter wavelength for energy in said center conductor insulating section of said mean frequency, said outer conductor having a pair of opposed spaced flanges at adjacent ends of said first and second portions thereof extending radially outward from an orthogonal to said common axis, said outer conductor insulating section being a thin annular disk orthogonal to said common axis with opposite sides in contact with both opposed faces of said spaced flanges for a radial distance substantially equal to a quarter wavelength for energy in said outer conductor insulating section at said mean frequency."

Appellant's application discloses a coaxial choke coupler for connecting two coaxial cable sections to transmit electrical energy therebetween at high frequencies of an order of 100 megacycles to 5000 megacycles. In connection with high frequencies, it is disclosed that the coupler operates with slight leakage and a minimum of impedance between the line sections. The application states:

"The devise of the present invention may have many uses, as for instance in mounting a high, ultra high, or super high frequency transmitter on top of a low frequency insulated radio tower. In this case the problem is to transmit these very high frequencies through the tower which is insulated and maintained at potential above the ground without disturbing the existing electric system."

The coupler includes an inner conductor spaced concentrically within a hollow outer conductor with the conductors adapted for connection at each end to the corresponding conductors of one of the coaxial cable portions to be interconnected. A longitudinal or sleeve type insulating joint having a length corresponding to a quarter wavelength at the mean or average frequency to be transmitted is interposed midway in the inner conductor of the coupler. Interposed in the outer conductor is a radial or disc type insulating joint comprising two opposed disc members which extend orthogonally outward in spaced insulated relationship. The radial distance that the discs extend from the outer conductor portions is made equal to approximately a quarter wavelength at the mean frequency of the energy to be transmitted.

The application also discloses a modified construction referred to as a three stage coupler. That structure does not require description here since the additional features it involves are not recited in the claims on appeal.

The references relied on are:

| | | | | |
|---|---|---|---|---|
| Espley | 2,401,344 | June | 4, | 1946 |
| Salisbury | 2,451,876 | October | 19, | 1948 |
| Garfitt (British) | 598,375 | February | 17, | 1948 |

---

The Espley patent discloses a coaxial coupler for transmitting high frequency energy between two coaxial cable portions. Joint sections are interposed in both the inner and outer conductors of the coupler. The joint in the inner conductor is of the longitudinal type and is described as being a quarter wavelength in length. The joint in the outer conductor comprises a longitudinal sleeve section formed by an end portion of increased diameter coaxially surrounding

the other end portion over a length corresponding to a quarter of a wavelength.

The Salisbury patent discloses a high frequency coaxial line coupler which, like that of Espley, utilizes sleeve type joints of a quarter wavelength in both the inner and outer conductors.

The British patent to Garfitt relates to a coupler for connecting two wave guide portions which are relatively offset or are arranged for relative angular movement. The coupler comprises a continuous central conductor having an end extending into the interior of each of the wave guide portions and an outer conductor which is separated into two sections and disposed concentrically about the central conductor between the surfaces of the wave guide portions. It is stated in the patent that the central conductor, "instead of being supported inside the outer conductor by spacers of solid dielectric material as is usual in the coaxial cable type of feeder," is supported by a rectangular metal plate or septum secured to the inside of the outer conductor.

The construction of the outer conductor of Garfitt is described as follows:

"The outer conductor of the feeder arrangement 3 is split transversely into two coaxial parts 3′ and 3″ at a point clear of the septum 7, the parts 3′ and 3″ being fixed respectively to the waveguide portions 1 and 2. A capacity joint 8 is provided between the adjacent ends of the parts 3′ and 3″ *to reduce energy leakage*. This may be of either of the forms illustrated in section in Figures 2 and 3. The spacing of the overlapping parts may be about 1 mm. and the length of the passage between them equal to about one quarter of a wavelength (of the transmitted energy in air)." [Emphasis ours.]

Figure 2, referred to in the quotation, shows a longitudinal or sleeve type joint in the outer conductor. Figure 3 shows a radial or disc type joint such as is employed in appellant's coupler.

The examiner rejected the claims on the ground that use of a disc type coupling or joint in place of the sleeve type joint in the outer conductor of the coaxial couplers of Espley and Salisbury would be obvious to one skilled in the art in view of Garfitt's showing of sleeve and disc type joints as alternatives for use in the outer conductor of his coupling device. In connection with that holding, the examiner stated:

"Applicant's device and the references of record are all concerned with the passage of energy without substantial radiation. The inner conductor by its use of the quarter wavelength sleeve joint will appear as a solid conductor for the band of frequencies to be passed. Although the inner conductor of Garfitt is solid, its teaching of the alternative use of sleeve or disc coupling for the outer conductor is not impaired since the inner conductors of the primary references can also be considered as a solid conductor for the band of frequencies involved. Although Garfitt will not provide D.C. or low frequency isolization [isolation] both Espley and Salisbury will, and the rejection has been made on the combination of these references. It will be noted * * * that the couplings of Garfitt are used to reduce 'energy leakage' or radiation."

It was further stated by the examiner that:

"The contention that the combination produces a new and unexpected result is not considered persuasive since the result set forth by applicant is inherent in the obvious combination of the references and hence does not confer patentability on the claimed combination. * * *."

In affirming the examiner's rejection, the board stated:

"In our opinion the substitution of a radial type joint such as shown in Fig. 3 of Garfitt for the joints of the basic references would [be] obvious to one skilled in the art, since

Garfitt teaches the interchangeable use of the longitudinal and radial choke joints for preventing radiation losses in a coaxial choke coupler."

Appellant concedes that "the change made * * * in modifying a prior art coaxial choke coupler having sleeve joints in the inner and outer conductors to include a disc line joint instead of the sleeve joint in only the outer conductor is but a slight change mechanically." He contends, however, that his coupler is not obvious under 35 U.S.C. 103, urging in support of the contention that the coupler provides new and unexpected results.

■ Relying on Loom Company v. Higgins, 105 U.S. 580, 26 L.Ed. 1177 and In re Ratti, 270 F.2d 810, 46 CCPA 976, appellant appears to take the position that the production of a new or improved result, rather than unobviousness, is the criterion to be applied to a rejection on a combination of references. However, these decisions, rendered more than seventy-five years apart, actually demonstrate, consistently with 35 U.S.C. § 103, that unobviousness is a requirement for patentability and that the results attained amount only to evidence which may be pertinent to the determination of whether that requirement is met.

Referring to the present case, appellant states:

"The new and unexpected results of the claimed invention are established by the affidavit * * * and accompanying Exhibit 1 * * *."

That exhibit, which reports tests said to have been made in 1950 under appellant's guidance, includes a graph comparing leakage losses of a coaxial choke coupler having a disc joint in its outer conductor and a sleeve joint in its inner conductor with the losses of a coupler having sleeve joints in both its inner and outer conductors. Although the examiner and the board have questioned the significance of a comparative test between these two devices, they do not dispute appellant's contention that the graph indicates that the tested device having a disc joint in its outer conductor had less leakage loss than the tested device using a sleeve joint in the outer conductor.

In referring to that exhibit, appellant's attorney asks:

"Would a man of his stature have an engineering report prepared back in 1950 describing the differences in results between his invention and a comparable prior art device involving tedious careful measurements unless his sincere expert opinion was that the differences in results were unpredictable and at that time unexplainable?"

Although appellant's reason for having the report prepared is not itself material, we think that his attorney's query leads to consideration of the factors which are determinative of the controlling issue here. In 1950, the Espley, Salisbury and Garfitt patents had all recently become available to the public. A person of ordinary skill in the art, with the objective of providing a coaxial coupler for use in the range of frequencies here involved, would have found in Garfitt a suggestion that a disc type joint, as well as a sleeve type joint, could be used to reduce energy leakage or radiation from the separated outer conductor, such as the outer conductor of the Espley or Salisbury coupler. There being no disclosure in Garfitt that either one of these joints is more effective than the other in reducing leakage, it is our opinion that it would have been obvious to construct a coupler using each of the outer joints disclosed by that reference and make comparative tests of leakage to determine which construction was most effective for the purpose at hand. Upon the tests showing, as appellant's report indicates they would, that the coupler with the disc joint permits less leakage, it would be obvious for the worker to choose that construction. As a matter of fact, the tests that appellant did make had that effect.

Appellant argues that the matter of maintaining low leakage is not the only

problem associated with coaxial choke couplers. He states in his brief:

"In its decision affirming the Examiner, the Board of Appeals discussed only one of the problems associated with coaxial choke couplers, the problem of maintaining low leakage radiation from the exposed gap in the outer conductor * * *. The Board did not discuss the problem of maintaining a low VSWR[1] over a wide bandwidth in the high frequency range while intercoupling both the inner conductors and the outer conductors by a low effective series capacity (low capacity presents high impedance at low frequencies) to effectively isolate the two coaxial transmission lines, intercoupled by the invention, at low frequencies * * *.

* * * * * *

"We recognize and have always conceded that a disc line quarter wavelength choke joint is old. Its property of presenting a low impedance between conductors that it intercouples has long been recognized as the equivalent of the same property of a quarter wavelength sleeve joint. But the properties of a disc line joint different from those of a sleeve joint *not* recognized in the prior art are that it will radiate less leakage power with a wider gap while still coacting with an inner conductor sleeve joint to provide a coaxial choke coupler with a low VSWR over a wide bandwidth."

We do not find appellant's contentions to indicate error in the board's decision. It is not disputed that the substitution of the quarter wavelength disc joint of Garfitt for the quarter wavelength sleeve joints in the outer conductors of the couplers of the basic references results in a coupler of the construction defined in the claims on appeal. The structure which is obvious from the prior art thus would, as indicated by the examiner, inherently provide the same results and properties as the device claimed by appellant.

Appellant's arguments concerning maintenance of a low standing wave ratio are not persuasive for another reason also. Although the affidavit and exhibit, by which appellant states the "new and unexpected results of the claimed invention are established," report measurements of the standing wave ratio of a coupler having a flange type joint, they do not provide a comparison with any other structure. Such measurements obviously fail to establish superiority as to that characteristic.

Appellant also argues that a disc joint permits the use of a wider gap. That argument is not significant since the application does not disclose a particular gap width or that this width should be greater than in a sleeve type joint.

The decision of the board is affirmed.

Affirmed.

RICH, Judge (dissenting).

Upon review of the record and the views of the examiner and the Board of Appeals I observe what, to me, are certain fatal defects in the reasoning by which they reached the conclusion that the invention defined by the claims on appeal is unpatentable. Appellant has more than adequately pointed out these defects in his brief and, in my judgment, the brief of the Patent Office Solicitor, thereafter filed, either failed to answer them or avoided discussion of them.

---

1. VSWR, not defined in the application, apparently is an abbreviation of voltage standing-wave ratio. See Radio Engineering, Terman, Third Edition, McGraw-Hill (1947), page 79, footnote 1 which reads:

"Standing-wave ratio as used here is expressed in terms of voltage (or current) and is sometimes referred to as voltage-standing wave ratio (abbreviated VSWR), to distinguish from the ratio expressed in terms of power (proportional to the square of the voltage)."

Standing-wave ratio is described in Terman as a measure of the relationship of reflected and incident waves in a transmission line.

The situation as it appears to me is this:

Alford, a man of great skill and experience and a recognized expert in the radio field, by making what appears through hindsight to be a relatively simple mechanical change, combined certain features old in this art to obtain improved electrical results and advantages.

The principal alleged advantage, constantly reiterated in the application, is reduction in leakage of radiation from already known coaxial choke couplers used in coaxial lines for transmitting high to very high radio frequencies. As Alford's brief points out, coaxial choke couplers were "conventional", they couple high frequency energy from one coaxial line to another while insulation separates both the inner and outer conductors of one line from those of the other. Such couplers had insulated *sleeve* joints in the inner *and outer* conductors and it was also known to make the sleeves of a length corresponding to a quarter wavelength, for the mean wavelength of the frequency band to be conducted, for reasons well known to the art. This is no part of the invention.

As Alford's brief frankly states, it was also known at the time he made his invention, and as shown by the Garfitt British patent, to use annular disc or flange capacity (i. e. separated and insulated) joints of quarter wavelength dimension in coupling hollow tubes used as wave guides to conduct oscillatory electromagnetic energy at ultra-high frequencies. Garfitt shows such a disc joint *and he also shows a sleeve joint* and that their dimension is a quarter wavelength; and he says that the reason one uses such a joint (either sleeve or disc) is "to reduce energy leakage." The important thing to notice about the Garfitt disclosure is, however, that his teaching is that *so far as minimizing leakage is concerned, it doesn't make any difference which kind of joint you use.*

Now Alford was not just inventing joints. What he was trying to do and in fact did was to design a coaxial choke coupler with reduced radiation leakage— *less* leakage than is present in the conventional coaxial choke couplers with two sleeve joints.

The invention which he made and is claiming in the claims on appeal is a *new combination,* not a flange joint. The combination is a coupler with all the known features of coaxial choke couplers such as inner and outer conductors and spacing filled with insulation and joints of quarter wave length dimensions *but* wherein the inner conductor joint or coupling is a sleeve joint and the *outer* tubular conductor *joint is a disc or flange joint.* This *combination* was unknown to the art. It is the combination which produces the improved results.[1] The two coaxial coupler references show sleeve joints in both conductors. Garfitt shows a joint in the outer tubular wave guide which can be either sleeve or disc—with no reason for preferring either—and no joint whatever in his inner conductor, since he does not have the kind of a coaxial *choke* coupler with which Alford is concerned.

Viewed by hindsight, and as a mere mechanical construction, the new combination may appear to be a slight change and one which would perhaps be of no significance to the art *but for the fact that it produces advantageous results which the prior art does not suggest could be achieved by the change made.*

Alford invented a coaxial choke coupling that reduced radiation leakage loss by combining old elements *in a new way* which the art did not suggest doing. At

---

1. In truth this would appear to be something of an over-simplification since a full explanation of *why* there is an improvement in the radiation leakage situation requires going into much greater detail such as that set forth in the 5 printed pages of the Alford affidavit exhibit and its accompanying illustrations and graphs. It appears to me that it was Alford's contribution to the art, as appears from that exhibit, that "Disc line couplers have lower radiation for a given value of low-frequency capacitance." I find no suggestion of this phenomenon in the prior art of record, but rather a contrary indication.

least in my view of the matter the art did not suggest doing it. The majority would perhaps say, with the Patent Office, that Garfitt suggests doing it but I challenge such a view. The art was already using outer conductor sleeve joints in choke couplings. Garfitt shows both sleeve and disc couplings and says, in effect, that if they are quarter wave length *they both reduce leakage equally well*. So clearly this patent contains no suggestion to use a disc coupling in place of a sleeve joint in the outer conductor of a choke coupling to reduce leakage further than it has already been reduced (or, more accurately, minimized) by the use of the supposedly equally good sleeve joint.

Challenged with the proposition that the substitution was obvious, Alford countered with the time-honored answer that even if it appeared so on its face it nevertheless resulted in a *patentable* invention since the advantages produced were substantial and unpredictable, establishing them by affidavit evidence. I have no doubt that under a long line of cases in this court, as well as in other courts, such proof with respect to an admittedly new combination would have been found acceptable to establish patentability prior to 1952, when the requirement of "invention" was put into the statute, 35 U.S.C. § 103, in terms of what would be unobvious to one of ordinary skill in the art at the time the invention was made. In re Holt, 162 F.2d 472, 34 CCPA 1129. Since section 103 clearly was not included in the statute for the purpose of making it more difficult for the inventors of new combinations to obtain patents on their inventions which produce new, unexpected, and advantageous *results* which would (by virtue of unexpectedness) not have been obvious, I can see no reason for ignoring established case law. A casual perusal of the legislative history of section 103 will show that the intent was that it should have exactly the opposite effect it is being given in this case.

The majority appears to accept the adequacy of Alford's evidence of advantages, saying:

"Although the examiner and the board have questioned the *significance* of a comparative test between these two devices [the prior art coupler with inner and outer sleeve joints and applicant's coupler], *they do not dispute appellant's contention * * * that the tested device having a disc joint in its outer conductor had less leakage loss* than the tested device using a sleeve joint in the outer conductor." [My emphasis.]

The majority proceeds from an examination and apparent acceptance of appellant's contention to the following conclusion, which I regard as wholly unjustified on the record before us:

"A person of ordinary skill in the art, with the objective of providing a coaxial coupler for use in the range or frequencies here involved, would have found in Garfitt a suggestion that a disc type joint, as well as a sleeve type joint, could be used to *reduce* energy leakage or radiation from the separated outer conductor, *such as the outer conductor of the Espley or Salisbury coupler*. There being no disclosure in Garfitt that either one of these joints [sleeve or disc] is more effective than the other in reducing leakage, it is our opinion that *it would have been obvious to construct* a coupler using *each* of the outer joints disclosed by that reference *and make comparative tests* of leakage *to determine* which construction was the most effective for the purpose at hand. Upon tests showing, as appellant's report [the affidavit evidence] indicates they would, that the coupler with the disc joint permits less leakage, *it would be obvious* for the worker *to choose* that construction. As a matter of fact, the tests that appellant did make had that effect." [My emphasis.]

The point I want first to emphasize in this rather cart-before-the-horse analysis of the situation is that, by the majority's own reasoning, the point at which it became *obvious* what the construction of the coupler *should* be was at the very end of a considerable piece of research consisting of deciding to build *two* different couplers, building them, testing them, and determining which was best. It is usually thought that it is the purpose of the patent system to encourage such research, not to deprive people of patents because they have carried it on successfully.

The next point is, that by the majority's own admission, the Garfitt patent does *not* suggest that a disc joint is any more effective in minimizing leakage of radiation than a sleeve joint. Since the art already had sleeve joints in coaxial choke couplers, inside and out, there is absolutely no suggestion in Garfitt to change that construction, and *it is on the basis that such a suggestion exists* that the Patent Office rejected the claims on a combination of either Espley or Salisbury with Garfitt.

In any case, the majority approach to the problem nullifies the rule of law which has long been followed that the seeming obviousness of a combination, or a product, can be overcome by proof of unexpected advantageous results and the majority never denies the existence of such results in this case. Bypassing case law, the majority rests its decision on section 103, which was intended to aid the discoverers of such new and unexpected results. First it finds the *structure* obvious and then ignores the advantageous unexpected properties, as of any legal significance whatever, by saying that the structure would "inherently provide the * * * results and properties." The codification of the former requirement of "invention" in section 103 was not intended to effect a substitution for one of the oldest positive indicators of the presence of patentable subject matter, namely, proven unexpected technical advantages, of the a priori judgment of non-technical courts as to the seeming obviousness to them of highly refined scientific instruments and devices.

In voicing this theory of obvious structure with "inherent" advantages—advantages which are to be ignored in deciding the issue of patentability—the majority is uncritically accepting the theory first propounded by the examiner who said:

> "The contention that the combination produces a new and unexpected result is not considered persuasive since the result set forth by applicant is *inherent in the obvious combination of the references* and hence does not confer patentability on the claimed combination." [My emphasis.]

What he meant, of course, was that the advantages, the existence of which he did not deny, were inherent *in applicant's claimed invention* which, in his view, would have been obvious over the references as he combined them in making the rejection. In other words, he too ignored the advantages. In fact he said in his answer that "this improvement * * * has no bearing on the rejection of the instant case which is on a combination of references," which is something of a non sequitur.

As to this combination-of-references rejection and the significance of the affidavit proof, the board had a different idea. It said, "assuming *arguendo* that the affidavit establishes that the instant joint in the external cylindrical conductor is less lossy than the joint in the outer conductors of either Salisbury or Espley," the comparative test should have been made "between the instant device and the device of Garfitt; or Salisbury or Espley modified in the light of Garfitt." In the absence of such data, the board expressed its intention to ignore the tests.

As to making a comparative test with Garfitt on radiation loss, I can see no possibility of this because Garfitt does not have a coaxial choke coupler at all, nor a coaxial transmission line.

As to the suggested comparison between the claimed coupler and the coupler

of either *Salisbury or Espley modified in the light of Garfitt,* this is foolishness. As appellant's brief points out in Point III, it "is nothing more than a requirement to compare the results of the invention with the results of the invention."

Whatever the rationalizations behind the various refusals in this case to take into consideration the unexpected advantageous results and give them legal effect, such refusal is contrary to long and well established law.

This is, in my opinion, a clear case for reversal.

SMITH, Judge (dissenting).

I am unable to agree with the conclusion reached by the majority, that since appellant's invention appears to be a *structurally* simple device, it is no more than an obvious combination of old elements. We should judge such a combination by the purpose which dictated its creation. Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 18 F.2d 66 (C.C.A.2d), cert. denied, 274 U.S. 753, 47 S.Ct. 765, 71 L.Ed. 1333.

Appellant's purpose in making the new combination embodying his invention was to meet the need for a coaxial choke coupler with less radiation leakage than couplers previously known while maintaining a low VSWR[1] in the coupler. Appellant succeeded in doing this by creating a new combination of individually old elements. What we are here concerned with is not these elements per se but rather with the new *combination* of those elements which, as shown by appellant's affidavit and the exhibit thereto, produces results of a magnitude which was unexpected from the prior art teachings.[2]

The majority, in finding appellant's invention structurally obvious over the prior art, seems to me to have ignored the unexpected results achieved by appellant's new combination of elements.

It is only *after* appellant's concept becomes known that his solution to the problems he encountered may appear to have been obvious. Only when viewed *after* appellant's concept had been embodied in the claimed structural combination, is it possible to see it as an obvious combination of the old elements shown in the references.

In Loom Company v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177, the Supreme Court in commenting on a comparable situation said:

"* * * At this point we are constrained to say that we cannot yield our assent to the argument, that the combination of the different parts or elements for attaining the object in view was so obvious as to merit no title to invention. Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention. It was certainly a new and useful result to make a loom produce fifty yards a day when it never before had produced more than forty; and we think that the combination of elements by which this was effected, even if those elements were separately known before, was invention sufficient to form the basis of a patent."

35 U.S.C. § 103 recognizes the doctrine of the Loom Company case, and to forestall the use of hindsight in testing the obviousness of the invention requires that patentability must be decided as of *the time the invention was made.* When thus considered, appellant's combination would not, it seems to me, have been ob-

---

1. I am here using this term in the sense and with the meaning ascribed to it in the majority opinion, i. e., "Voltage standing-wave ratio."

2. I refer here to the teachings that sleeve and radial disc joints have equal effect in minimizing radiation leakage.

vious to one of ordinary skill in the art. I have been unable to find any teaching in the cited prior art from which I am willing to conclude that appellant's invention was obvious to one of ordinary skill in the art, or which would suggest to such a person that he should take the course taken by appellant in producing his novel combination.

The examiner and the board would avoid the effect of appellant's affidavit and exhibit which show the surprisingly superior results achieved by appellant's coaxial coupler, for the reason that they do not show comparative radiation loss tests with the Garfitt device. Garfitt, it seems to me, discloses nothing but a coupling for hollow tubes used as wave guides. It is not a coaxial coupler of the type disclosed by appellant.

The Espley and Salisbury references, like the claimed invention, require insulating sections in series with *both* inner and outer conductors in order to function as a *coaxial transmission line*. The Garfitt reference, while it discloses a conducting septum, uses this septum to *short circuit* the inner conductor to the outer conductor, and thus functions as a *rectangular waveguide*.

While the low impedance of a disc line quarter wavelength choke joint between two conductors was recognized in the art, its coaction with an inner conductor sleeve joint to provide a coaxial choke coupler with low VSWR over a wide band width cannot be shown by comparative test with Garfitt unless Garfitt is first modified, in the manner taught by appellant, so that it can function as such a coaxial choke coupler. I agree, therefore, with appellant's view set forth in the dissenting opinion of Judge RICH that this requirement "is nothing more than a requirement to compare the results of the invention with the results of the invention."

I also am unwilling to approve, as of the time appellant's invention was made, the suggestion made by the board that the couplers shown in Salisbury and Espley could be modified by the Garfitt device. This modification, it seems to

me, was first suggested in this art by appellant.

I agree with Judge Rich that the majority's conclusion is inconsistent with the long established law in this court and elsewhere regarding the patentability of new combinations of old elements which produce results as unexpected as those which are reported in the record here. I am unable to reconcile the holding of the majority here with the principles I find in a long line of cases including Loom Company v. Higgins, supra, Washburn & Moen Mfg. Co. v. Beat'Em All Barbed Wire (The Barbed Wire Patent), 143 U.S. 275, 283, 12 S.Ct. 450, 36 L.Ed. 161; Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 53 L.Ed. 1034; In re McKenna et al., 203 F.2d 717, 40 CCPA 937, and In re Holt, 162 F.2d 472, 34 CCPA 1129.

I would, therefore, reverse the decision of the board.